## Dockum *v.* Robinson.

Verbal *directions* and *instructions* for drawing up a written will do not constitute a nuncupative will, although spoken in the presence of the proper number of witnesses requested to bear witness thereto, and reduced to writing and offered for probate according to the statute.

Words, to have such testamentary effect, must be spoken by the decedent, with the intention thereby to make a final disposition of his property.

By the Revised Statutes, ch. 156, § 15, three witnesses present must be requested to bear witness to the will of the testator, in order that his words may be proved as a nuncupative will.

APPEAL from a decree of the judge of probate for the county of Rockingham, disallowing the following memorandum in writing, propounded by the appellant as the nuncupative will of John Towle:

" Be it remembered that on the eleventh day of October, A. D. 1849, John Towle, late of Hampton, in the county of Rockingham and State of New Hampshire, deceased, in his last sickness, at the dwelling-house of Widow Sarah Fogg, in North Hampton, in said county, where he was taken sick from home and died before his return, in the presence of the subscribers, who were requested by the said John Towle to assist in making his last will and testament, which he did in the following words :

1.  I want Appleton Towle to have three dollars.

2.  I want John Dearborn to have four hundred dollars.

3.  I want Widow Fanny Knowles to have two hundred and thirty dollars.

4.  I want Widow Sarah Fogg to have two hundred dollars.

5.  I want Gowen Dockum to have two hundred and thirty-three dollars.

6.  I want David Knowles to have the rest, (being the balance of the notes shown to us.)

And the said testamentary words of the said John Towle were by us reduced to writing within six days from the time of declaring the same, to wit, on the fifteenth of October, A. D. 1849.

Signed,    ABRAM B. LORD,
GEORGE ODELL,
DAVID KNOWLES,
FANNY KNOWLES."

The parties agreed to the following statement of facts:

On the second day of October, 1849, the decedent was taken sick at the house of Sarah Fogg, in North Hampton, where he died on the eleventh day of the same month, not being able to return home.

The decedent was about fifty years of age. Dr. A. B. Lord informed him that he could live but a little while.

He then said he should like to dispose of his property. That night David Knowles staid with the decedent, who requested said Knowles to return, after he had been home in the morning, and go for Dr. Odell, to make his will, which he, the said Knowles, did. Some time in the course of the same morning, the decedent told Dr. Lord that he had sent for Dr. Odell to come and make his will, and that he was coming that afternoon, and that he wished him (Dr. Lord) to come also. Accordingly, in the afternoon of the same day Drs. Lord and Odell went to the decendent's room for

the purpose of assisting him in making his will. David Knowles was there also. The decedent then requested Knowles to take his (the decedent's) key, and go to his trunk and get his pocket-book, containing his notes. Knowles then got the decedent's pocket-book as requested, and showed him the notes, and the decedent took them and looked them over, and stated that he wished certain persons, naming them, to have certain notes, which he specified. Dr. Lord then suggested to the decedent that he had better specify certain amounts for each one, to which he replied that it would be better, and he then requested Dr. Lord to cast and add up the notes, which he did, and told the decedent the amount. The decedent then said:

" I want John Dearborn to have four hundred dollars.

I want Gowen Dockum to have two hundred and thirty-three dollars.

I want Widow Fanny Knowles to have two hundred and thirty dollars.

I want Widow Sarah Fogg to have two hundred dollars.

I want Appleton Towle to have three dollars.

I want David Knowles to have the rest," and he named John D. Neal for executor, and requested Dr. Odell to write his will accordingly.

These directions were given in the presence and hearing of Dr. George Odell, Dr. Abram B. Lord, David Knowles and Fanny Knowles, who were in and out of the room, all of whom signed the aforesaid memorandum propounded for probate.

While the decedent was giving the above directions, Dr. Lord made a memorandum of them, and then said Lord and Odell withdrew to another room to draw up a will in form. Dr. Lord soon returned to the decedent, and asked him if he had not better have David Knowles for executor, to which the decedent replied that he did not think of him, but he had rather have him, and Dr. Lord then read over to

him (the decedent) the memorandum he had made of his directions, and asked him if it was right, and the decedent replied that it was.

Dr. Lord then went back into the room in which he had left Dr. Odell, and there they (Lord and Odell) consulted together about the form in which the will should be drawn. They proposed among themselves making a variation from what the decedent directed, and to give to each legatee above named a certain per cent. of the whole amount of the notes, so that each one should have the same sum which the decedent had mentioned, if all the notes should be collected ; but if not, they would all respectively have less in proportion. They made calculations what the per cent. would be for each one, and concluded to write the will in that way, and read it to the decedent, and see if he approved it; if not, they would write another will. Dr. Odell then commenced writing the will, and wrote the caption and the first item as follows: " I give to Appleton Towle three dollars."

They were then informed by the nurse that the decedent was worse.

. Dr. Lord immediately went to him, and found him dying and insensible. He expired in a few minutes.

At the time of giving the above directions the decedent was of sound mind. David Knowles and Fanny Knowles, who signed said memorandum, are the same persons to whom legacies are therein given ; and Fanny Knowles and her mother, Sarah Fogg, lived together in the house where decedent died. The estate of the decedent was appraised at $1,559,96, which consisted of $74,67 in cash, $42,65 in miscellaneous articles, and $1,442,64 in notes.

The testamentary words were reduced to writing, and signed as aforesaid, within six days from the time they were declared by the decedent, to wit, on the 15th day of October, 1849, and the same was presented for probate within six months, to wit, on the 19th of November, 1849.

Dockum *v.* Robinson.

*Marston,* for the appellant.

It is not necessary that the testator should intend to make a nuncupative will.

If he declares how he desires to dipose of his property, for the purpose of having his will reduced to writing, and is prevented from executing the same by delirium or death, it is a good nuncupative will.

It is only necessary that the testator's intention should be made manifest with regard to the disposition of his property.

Nor is it necessary that the testator should declare in so many words that such is his will.

If the words are spoken with an intention to bequeath, it is sufficient.

It is not necessary that the testator should request the persons present, in any set form of words, to bear witness that such is his will. The statute does not prescribe a formula to be adopted by the testator, nor is it necessary that he should know what the language of the statute is. It is sufficient if the testator declares his intentions with regard to the disposition of his property, and makes known to the witnesses present, by any words or acts, his desire that they should understand what that disposition is. *Mason* v. *Dummen,* 1 Mumford 456; *Baker* v. *Dodson,* 4 Humph. 342; *Parsons* v. *Parsons.* 2 Greenl. 298; *Freeman* v. *Freeman,* 1 Lee's Eccl. Rep. 343; Shepard's Touchstone 391.

The object of the formalities required by the statute, in the case of nuncupative wills, is to prevent casual conversations from being imposed upon the court as testamentary which were not so intended; and where it is manifest that the testator intended to bequeath his property, courts will effectuate that intention.

In *Wyndham* v. *Chetwynd,* 1 Burr. 421, Lord *Mansfield* said : " It is clear that judges should lean against objections to the formality of wills, and they have always done so in every construction upon the words of the statute.

If a distinct and independent part of a nuncupative will be not committed to writing, the residue will not be vitiated. *Marks* v. *Bryant*, 4 Henning & Mumford 91.

If the witnesses to a nuncupative will do not agree as to all the bequests, the will can be established only so far as they do agree.   *Portwood* v. *Hunter*, 6 B. Munroe 538.

*Stickney & Tuck*, for the appellee.

We contend that the facts stated do not prove a nuncupative, within the meaning andintent of the statute, for the following reasons:

1.   Because the decedent did not declare or intend it to be his nuncupative will.

2.   Because he did not request the witnesses to bear witness thereto.

3.   Because there were not three competent witnesses present, two of those present, David and Fanny Knowles, being legatees under the will, and not competent to prove it.

4.   Because the paper presented for probate does not show upon its face that all the requisitions of the statute have been complied with.

Nuncupative wills are not favorites of the law.   To make a good nuncupative will, all the requisites of the statute must be strictly complied with.   The object of the statute was to prevent fraud and imposition, and to remedy the great abuses which existed in practice.   To effect that object, courts have construed the statute strictly, and required all its provisions to be strictly complied with.   2 Black. Com. 500; *Prince* v. *Hazelton*, 20 Johns. 514; *Bennett* v. *Jackson*, 2 Philimore 190; *Porter's Appeal*, 10 Bains 254; *Priscilla E. Yamell's Will*, 4 Rawle 46.   In this case the court say, " Nuncupative wills, though tolerated, are by no means favorites of the law."   All the provisions of the law must be strictly complied with.   *Dorsey* v. *Shepard*, 12 Gill & Johns. 192.   " Nuncupative wills are not favorites of the law."

More strict and stringent proof is required of nuncupative wills than of written wills.

It is said in 2 Black. Com. 500, and in 1 Jarman 89, that nuncupative wills are put under so many restrictions that they have fallen into disuse, and been practically abolished.

The first point we make is, that the decedent did not declare or intend it to be his nuncupative will, as required by the statute.

The decedent intended to make a written will, and gave directions for that purpose. He did not intend to make, and did not think he was making a nuncupative will.

Now we contend that this is not a compliance with the statute. An intention to make a written will is not making a nuncupative will. The intention amounts to nothing until it is carried into execution; and a will, either written or nuncupative, is of no effect until it is executed with all the formalities required by law. If the party, for any cause, fails to carry his intention into execution, the whole matter fails. The court cannot, after his death, execute his intention, and cannot make for him a nuncupative will, or convert the written will which he intended to make into a nuncupative will. We contend that the whole matter failed. He made no will; and if the court establish this paper as his will, they will be making for him what he never intended to make himself.

*Porter's Appeal*, 10 Bains 254, before cited, is a case in point. The decedent was in his last sickness, and the requisite number of witnesses were present. He said he wished to make his will, and stated how he wished to dispose of his property. A person wrote it down as he stated it, and was requested to witness it as his will. The person went out to get the will drawn up in proper form, and while he was out the decedent died. The court held that it could not be established as a nuncupative will. The court say that an intention to make a written will is not a nuncupative will. If the written will was not complete, the

court cannot make a nuncupative will for him. The facts in that case are substantially the same as in this case. The only difference at all material, that is recollected is, that the decedent, in that case, owned both real and personal estate; but that can make no difference in principle, because if the will had been regular and correct in all respects, it might have been established and had effect as to the personal estate.

If this paper be established as the nuncupative will of John Towle, the court must make it for him. They must set up for him a will which he never intended to make.

The second point we make is, that the decedent did not request the witnesses to bear witness thereto, as required by the statute.

The statute is express that no nuncupative will shall be valid unless the witnesses were requested by the testator to bear witness thereto. There was no such request in this case. The memorandum, drawn up and subscribed by the witnesses, states no such request. It states merely that they were requested to assist in making his will; and from the frequent suggestions made by them, it would seem that they understood that the assistance which he requested was not merely to write down what he directed, but to make suggestions how he ought to make his will.

Perhaps it is not necessary to use the precise language of the statute, but there should be something from him indicating to the witnesses that it was his wish that they should bear witness that it was his will. There is nothing of that kind in this case, and it is perfectly clear that the witnesses did not understand that they were so requested, because when they went out to write the will, they determined to write it different from what he had directed. One object of this provision is, that the attention of the witnesses should be called to what he said, that they might remember it.

The statute, on this point, in some of the States, is differ-

ent from our statute. In Maine, the words "or to that effect," are added; and in Virginia and some other States, there is a similar qualification. In those States, the provision is that such wills are not valid unless the witnesses were requested by the testator to bear witness thereto, or something to that effect. This gives the court a wide latitude of construction, and, on that account, it is believed, they draw inferences from his acts, and if they find anything in his acts which is equivalent to that, they hold it sufficient. Our statute has no such words, and the cases cited by the appellant cannot properly be applied to cases under our statute, and the court cannot, under our statute, draw inferences from his acts, and cannot say, because he intended to make a written will, and gave directions for that purpose, that he thereby requested the witnesses to bear witness that it was his will. This part of the statute is to be construed strictly.

In *Bennet* v. *Jackson*, 2 Phil. 190, before cited, the court, when speaking of this part of the statute, say, "The words of the statute have always been construed strictly." If a strict construction be put upon that statute, it is difficult to perceive how any such request can be shown. There was, in fact, no such request made by him, and we contend that the court cannot infer any such request from his acts.

The third point which we make is, that there were not three competent witnesses present, as required by the statute.

Two of the witnesses, David and Fanny Knowles, are legatees under the will, and not competent to prove it.

The provisions of our statute, that any legacy to a subscribing witness is void, is confined to written wills, and does not apply to witnesses to nuncupative wills.

Before that provision was made, it was held in England, that where a legacy was given to a subscribing witness, the whole will was invalid, and that the witness could not release his interest, and make himself competent. 1 Jarman

62. In consequence of those decisions that provision was made, but it applied only to written wills, and not to nuncupative wills. The law intended that there should be three disinterested and competent witnesses, at the time the will was made.

The fourth point we make is, that the paper presented for probate does not show upon its face that all the provisions of the statute have been complied with. It does not show or state that the witnesses were requested to bear witness thereto.

A will, whether written or nuncupative, presented for probate, should appear on its face to be a good will. If a written will, it should appear to be executed with all the formalities required by law, and if it appeared to have no seal, or only two witnesses, it could not be proved. So a nuncupative will should appear upon its face to be executed with all the formalities required by the statute. The paper presented for probate, in this case, does not show and does not state that the witnesses were requested to bear witness thereto. This is a material matter, which should appear from the paper itself, and cannot be supplied by other evidence.

Woods, J. By the provisions of chap. 156 § 15 of the Rev. Stat., " No nuncupative will shall be valid where the personal estate bequeathed shall exceed in value one hundred dollars, unless it was declared in the presence of three witnesses, who were requested by the testator to bear witness thereto, in his last sickness, and in his usual dwelling, except where he was taken sick from home and died before his return ; nor unless a memorandum thereof was reduced to writing within six days, and presented for probate within six months from the making thereof."

This section of the Revised Statutes is a substitute for the first and second sections of the act of February 16, 1791, which is a reënactment of the seventh and eighth sec-

Dockum *v.* Robinson.

tions of the provincial act of 5 George I, and nearly verbatim with the statute of 29 Charles II, chap. 3, commonly called the statute of frauds. Our statute of 1791 provides, first, " That no nuncupative will shall be good where the estate thereby bequeathed shall exceed the value of thirty pounds, which is not proved by the oaths of three or more witnesses, who were present at the making thereof, nor unless it be proved that the testator at the time of pronouncing the same, bid the persons present, or some of them, bear witness that such was his will, or to that effect; nor unless such nuncupative will be made at the time of the last sickness of the deceased, and in the house of his or their habitation or dwelling, or where such person hath been resident for the space of ten days or more, next before the making of such will; except where such person was surprised or taken sick being from his own home, and died before he returned to his dwelling." And it provides further, " that after six months passed from the speaking the pretended testamentary words, no testimony shall be received to prove any nuncupative will, except said testimony, or the substance thereof, be committed to writing within six days after making said will."

These statutes contain the exceptions in favor of testamentary dispositions of personal property made by mariners at sea, and soldiers in actual military service, supplied by our statute of 1848 chap. 726.

The peculiar circumstances in which this kind of will is necessarily made, have been the cause that two opposing general views have been taken of it.

From natural tenderness towards the last wishes of the dead, and a prevailing inclination to give the utmost breadth and effect to the function of the owner of property, by extending his control over it beyond the term of his life, and his capacity to enjoy it, and according to him something like a second benefit of it, in the persons of the objects of his affections, an argument has been drawn for admitting

words to be proved as wills, without a very rigid applica-
tion of the legal tests.

While on the other hand it has been urged, that the liabil-
ity of witnesses to err in respect to words spoken in sickness
and pain, and under the influence of grave apprehension,
the danger that the party in such conditions may himself
overlook important objects, and omit material qualifications,
having no opportunity, as in a written will, to revise his
work, and the great facility with which such wills may be
produced, by the fraud of unscrupulous attendants, by stran-
gers among whom the casualties of sea or of land or sud-
den pestilence may have thrown the dying traveller, make it
the duty of courts in the construction of statutes, to lean
strongly against such forms of testament. Black. Com. 500;
*Prince* v. *Hazelton,* 20 Johns. Rep. 502.

In the decision of this case, it may be sufficient however
to premise, that both written and oral wills derive their force
and validity from positive law. Both are sanctioned by ex-
press statute, and when executed in the manner which the
statute points out, without surprise, by parties legally com-
petent, are of equal consideration. And where a party dies,
omitting for any cause to make a will in either of the forms
recognized by law, no evidence as to what his wishes and
intentions might have been, can be heard in court; but the
silence of intestacy must prevail.

The question to be decided is, did the deceased, John
Towle, make the supposed nuncupative will in the form
and manner prescribed by law?

The civil law, in which the term originated, in addition
to a large class of privileged or unsolemn wills, as for exam-
ple, that of the mariner at sea, the soldier in service, the vic-
tim of sudden contagion, and the rustic, ignorant of letters
and of legal forms, recognized two modes of solemn testa-
ment, between which the Roman citizen had his option, as
of equal force and consideration, and, except of course in
the particulars of signing and sealing, requiring the same

somewhat arduous formalities for their effectual execution. These were the written and the nuncupative wills. 1 Browne's Civ. Law ch. 10.

The ecclesiastical courts, which had, from an early period after the conquest, jurisdiction of intestacy and wills of personal property in England, admitted both these kinds of will to probate, and applied to them the same general canons of evidence ; in these, as in most other particulars, deriving the outlines of their jurisprudence from the civil law. 1 Reeve's Hist. Eng. Law 72 ; 1 Browne's Civ. L. 338–9; Lex Testamentaria 576. Before the statute of frauds, the nuncupative will was required to be reduced to writing, and proved before the ordinary, before it could serve as the foundation of any action or defence. Lex Testamentaria 433, where are cited the Yearbooks 10 Ed. IV. 1 ; 5 Hen. V. 1 ; 4 Hen. VI. 1 ; 14 Hen. VI. 5 ; Fitz Executor 2 ; and *Verhorn* v. *Brewin*, 1 Ch. Rep. 192. And it seems probable, from the cases and authorities cited in *Prince* v. *Hazelton*, 20 Johns. Rep. 502, that its use had long before the statute of frauds, been, in practice at least, limited to cases of sudden and final sickness and apprehension of immediate death.

Whether we consider the nuncupative will, as used by the Roman to endow and dignify his personal successor, or as in later times in England, an expedient of hurry and alarm at the last hour, to direct the distribution of chattels, it must be regarded as having possessed at all times the essential qualities of a testamentary act. Like a written will or testament, it always has been and must be considered as a deliberate act, by which a party legally directs the distribution to be made of his property after his decease. The whole purview of the several statutes on this subject, as well as numerous phrases and expressions contained in them, plainly shew that they were intended to apply to an act designed by the party to be final and testamentary. They require the " will " to be " declared in the presence of three witnesses," requested by the testator " to bear witness thereto." The

old statutes required three witnesses to be " present at the making " of the will; that the testator at the time of pronouncing " the will " " shall bid the persons present bear witness that such is his will," and that " after six months from the speaking the pretended testamentary words, no testimony shall be received," &c.

Now an intention or a desire to make a will at some future time, however clearly expressed, however established in evidence, however earnestly cherished, and by whatsoever casualty defeated, is in no sense a will. Undoubtedly decisions are to be found seeming to be in some measure to the contrary of this. For example, in the construction of the statute of wills, (32 Hen. VIII,) authorizing the disposition of real estate by testaments made in writing by the party or by his direction, it had been held before the statute of frauds that memoranda dictated by the deceased to the physician for drawing up a will, though never read over to the deceased, and although the intended will was never reduced to writing, were a valid testament within the statute.

So notes delivered to counsel, with instructions to draw a will, were holden to be a will under the same statute. Comyn's Dig. Devise D. 1.

But the papers set up and allowed as wills in those cases, were plainly not intended as such by the parties dictating or writing them, and the decisions themselves may well be regarded as giving good occasion for the passage of the celebrated statute already mentioned, one of whose leading purposes it was to fix a clear boundary between the conditions of testacy and intestacy.

It is a perversion of language and a confusion of thought, to pretend, that directions to another to draw up a will in form for publication, is itself a published will. The party himself cannot be supposed to think that he is thereby performing a final act. In the very expression of his purposes, and giving his commands, is involved the condition that the

proposed disposition of his property shall not take effect, but in the particular form and manner that he has indicated.

This plain distinction between a will and the declaration of a purpose, or the giving of directions to make one, has justly been applied to cases, in which such purposes or directions, having failed by reason of sudden death or loss of faculties to be carried into effect, have afterwards been attempted to be set up as nuncupative wills.

In the case of *Winn* v. *Bob & a.*, 3 Leigh 140, the probate of the supposed testamentary words was denied upon the ground that it did not appear that the deceased, at the time of pronouncing them, had a present purpose of making a last will. " There was no expression or act of the sick man to show that he thought himself making a will; or whether he intended it to be by parol or in writing."

In the abstract of that case, it is stated that the deceased ought to " have a present intention to make a will and to speak the words with such intention, and should clearly indicate such intention by calling upon persons present to take notice or bear testimony that such is his will, or by saying or doing something tantamount, in substance, indicating plainly that the words spoken are designed as testamentary."

In the case before us, the deceased, Towle, being of the age of about fifty years, and possessed of some sixteen hundred dollars in cash and securities, was, while sick at the house of Sarah Fogg, advised of the fatal type of his malady, and expressed a desire of disposing of his property.

As to the means of doing that, he does not appear to have had any doubt. He sent for Dr. Odell to come and " make his will." He informed Dr. Lord that he had sent for Odell for that purpose, and desired him to come also. At the appointed time, in the presence of these gentlemen, who had met him for the express purpose of making his will, after some suggestions from Dr. Lord, which induced him to change somewhat his first plan of distributing his property, he expressed his wishes substantially in the words

set up as the will. It is distinctly found that these words were spoken by him in the way of directions to one or both those gentlemen, as to what the will, which they had come to write, should contain. No one who heard the words, suspected that they were uttered with a different intent, and it is evident from the sequel, that the deceased did so intend them. The two physicians retired to write the will; one of them soon returned to suggest alterations, which were accordingly adopted by the deceased, and then read over to him the memorandum, which had been made of the directions, and ascertained, by inquiring of the deceased, that they were correctly noted. He then retired again to write the will.

In every stage of this business are manifold proofs of the adhesion of the sick man to his first and only purpose, of making a written will; and there is no evidence whatever that he entertained for a moment, the thought of making an oral will. A sudden crisis of his sickness, and ensuing death, defeated his purposes.

If we could question for a moment the soundness and the application of the principles which seem to preclude us from admitting to probate as a nuncupative will, the words which have been propounded as such, the circumstances of this case would go far to remove such doubts, and point out the extreme hazard and difficulty of proceeding upon the grounds assumed by the appellants.

While the decedent appears to have been firm in his purpose of making a written will, a good degree of vacillation was shown as to what its precise provisions should be. His first plan was to bequeath the notes specifically, and to make Neal his executor. In both these particulars he submits with a singular facility to the suggestions of his friends, who at the moment of his death, had presumed so far upon his ductility in this regard, that without any consultation with him, they had begun to draw up a will still different from either of the first two which had been proposed. Upon

such evidence we may well doubt whether some further in-
fluences might not at the moment of signing and sealing,
have intervened to demolish all the prior schemes, and set
up something still new and different for a will.

Wholly unlike this case in every important particular was
that of *Parsons* v. *Parsons,* cited from the Maine Reports.
There were unquestionable indications, first, that the testa-
tor did not intend to make a written will, and secondly, that
he did intend his words to be taken and observed as and for
final directions concerning the disposal of his property after
his death. On being asked who he intended should have
his property after his decease, he replied, " his wife." His
father, who was the heir, being present, assented in express
terms, as one who had an interest. This opens the way to
understand the testamentary words, which he afterwards
pronounced in reply to a similar question—" all to my wife,
that is agreed upon." He then by a gesture invoked the at-
tention of the father, who again assented, and the testator
made the whole business once more sure, by saying to his
wife, " you see my father acknowledges it." It is plain that
the testator intended, by those words, to dispose of his pro-
perty, and by his gesture to bid his father bear witness to his
will; and from all the circumstances it is evident that he
fully believed he had accomplished his purpose.

If an intention to make a will had not been wanting in
the case before us, there was not such a request to three wit-
nesses present to bear witness to the supposed will, as the
statute requires. Whatever language, having anything like
that purport, was used by the deceased, was addressed to
the two physicians. No other person was directly or other-
wise requested to bear witness, and the act must fail, if
upon this ground alone.

We are therefore bound to conclude that the decedent,
John Towle, never intended or attempted to make a nuncu-
pative will. That if there was such an intention on his part,

it failed for noncompliance with the requirements of the statute, and that the decree of the probate court must be affirmed.

*Decree affirmed.*